# EXHIBIT A

 CT Corporation

TO: Joyce Jacobs
P1 Group, Inc.
13605 W. 96th Terrace
Lenexa, KS 66215

RE: **Process Served in Missouri**

FOR: P1 Group, Inc. (Domestic State: KS)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Standard Sheet Metal, Inc., Pltf. vs. P1 Group, Inc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Petition |
| **COURT/AGENCY:** | 16th Judicial Circuit Court, Jackson County, MO<br>Case # 1716CV21481 |
| **NATURE OF ACTION:** | Intellectual Property Litigation - Trade Secret infringement |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Clayton, MO |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 09/11/2017 at 13:10 |
| **JURISDICTION SERVED :** | Missouri |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after receipt, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | Heather F. Shore<br>Brown & Ruprecht, PC<br>2323 Grand Blvd., Suite 1100<br>Kansas City, MO 64108<br>816-292-7000 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via UPS Next Day Air , 1Z0399EX0122117432 |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 120 South Central Avenue<br>Suite 400<br>Clayton, MO 63105 |
| **TELEPHONE:** | 314-863-5545 |

Page 1 of 1 / AP

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of the package only, not of its contents.



IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| Judge or Division:<br>JAMES DALE YOUNGS | Case Number: 1716-CV21481 |
|---|---|
| Plaintiff/Petitioner:<br>STANDARD SHEET METAL, INC.<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>HEATHER F SHORE<br>2323 GRAND BOULEVARD<br>STE. 1100<br>KANSAS CITY, MO 64108 |
| Defendant/Respondent:<br>P1 GROUP, INC. | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 |
| Nature of Suit:<br>CC Other Tort | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: P1 GROUP, INC.
Alias:

**PRIVATE PROCESS SERVER**

C T CORPORATION SYSTEM
120 SOUTH CENTRAL AVENUE
CLAYTON, MO 63105

COURT SEAL OF

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

08-SEP-2017
Date

Clerk

JACKSON COUNTY

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____ (title).

☐ other _____

_____ (address)

Served at _____

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____
Printed Name of Sheriff or Server

_____
Signature of Sheriff or Server

Must be sworn before a notary public if not served by an authorized officer:

Subscribed and sworn to before me on _____ (date).

(Seal)

My commission expires: _____
Date

_____
Notary Public

| Sheriff's Fees | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Sheriff's Deputy Salary | | |
| Supplemental Surcharge | $ 10.00 | |
| Mileage | $_____ | (_____ miles @ $._____ per mile) |
| Total | $_____ | |

A copy of the summons and a copy of the petition must be served on each Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (2-2017) SM30 (JAKSMCC) For Court Use Only: Document Id # 17-SMCC-9403  1 of 1 Civil Procedure Form No. 1, Rules 54.01 – 54.05, 54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 4:17-cv-00858-HFS   Document 1-1   Filed 10/11/17   Page 3 of 69



IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| Judge or Division:<br>JAMES DALE YOUNGS | Case Number: 1716-CV21481 |
|---|---|
| Plaintiff/Petitioner:<br>STANDARD SHEET METAL, INC.<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>HEATHER F SHORE<br>2323 GRAND BOULEVARD<br>STE. 1100<br>KANSAS CITY, MO 64108 |
| Defendant/Respondent:<br>P1 GROUP, INC.<br>Nature of Suit:<br>CC Other Tort | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106<br><br>(Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: **SMITTY BELCHER**
Alias:

**2000 PALMER COURT**
**LAWRENCE, KS 66047**

# PRIVATE PROCESS SERVER

**COURT SEAL OF**

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

08-SEP-2017
Date

Clerk

**JACKSON COUNTY**

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years.
☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____ (title).

☐ other _____ .

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____         _____
Printed Name of Sheriff or Server              Signature of Sheriff or Server

Must be sworn before a notary public if not served by an authorized officer:

*(Seal)*

Subscribed and sworn to before me on _____ (date).

My commission expires: _____
                                    Date                              Notary Public

| Sheriff's Fees | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $ 10.00 |
| Mileage | $_____ ( _____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (2-2017) SM30 (JAKSMCC) *For Court Use Only:* Document Id # 17-SMCC-9405   1 of 1Civil Procedure Form No. 1, Rules 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo
Case 4:17-cv-00858-HFS   Document 1-1   Filed 10/11/17   Page 4 of 69

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.


                                        Circuit Court of Jackson County

 IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI



| Judge or Division:<br>JAMES DALE YOUNGS | Case Number: 1716-CV21481 |
|---|---|
| Plaintiff/Petitioner:<br>STANDARD SHEET METAL, INC.<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>HEATHER F SHORE<br>2323 GRAND BOULEVARD<br>STE. 1100<br>KANSAS CITY, MO 64108 |
| Defendant/Respondent:<br>P1 GROUP, INC. | Court Address:<br>415 E 12th |
| Nature of Suit:<br>CC Other Tort | KANSAS CITY, MO 64106 |
| | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: BRUCE BELCHER

Alias:

1711 E. 1000 ROAD
LAWRENCE, KS 66049

# PRIVATE PROCESS SERVER

**COURT SEAL OF**

*JACKSON COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

08-SEP-2017
Date

_____
Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant/Respondent's family over the age of 15 years.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____ (title).

☐ other _____

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____     _____
Printed Name of Sheriff or Server          Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

*(Seal)*

Subscribed and sworn to before me on _____ (date).

My commission expires: _____
Date

_____
Notary Public

| Sheriff's Fees | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $ 10.00 |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| Total | $_____ |

A copy of the summons and a copy of the petition must be served on each Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (2-2017) SM30 (JAKSMCC) *For Court Use Only:* Document Id # 17-SMCC-9406  1  of 1Civil Procedure Form No. 1, Rules 54.01 – 54.05,
54.13, and 54.20, 506.120, 506.140, and 506.150 RSMo

Case 4:17-cv-00858-HFS   Document 1-1   Filed 10/11/17   Page 6 of 69

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made. Thank you.

Circuit Court of Jackson County



IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JAMES DALE YOUNGS | **Case Number:  1716-CV21481** |
| Plaintiff/Petitioner:<br>STANDARD SHEET METAL, INC. | Plaintiff's/Petitioner's Attorney/Address<br>HEATHER F SHORE<br>2323 GRAND BOULEVARD<br>STE. 1100<br>KANSAS CITY, MO  64108 |
| **vs.** | |
| Defendant/Respondent:<br>P1 GROUP, INC. | Court Address:<br>415 E 12th<br>KANSAS CITY, MO  64106 |
| Nature of Suit:<br>CC Other Tort | |
| | (Date File Stamp) |

## Summons in Civil Case

**The State of Missouri to:** ALLEN SUPPLEE
Alias:

**2319 N.E. SPRINGBROOK**
**BLUE SPRINGS, MO 64014**

# PRIVATE PROCESS SERVER

*COURT SEAL OF*

*JACKSON COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

08-SEP-2017
Date _____ Clerk

Further Information:

---

**Sheriff's or Server's Return**

Note to serving officer:  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____ (title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____          _____
Printed Name of Sheriff or Server          Signature of Sheriff or Server

**Must be sworn before a notary public if not served by an authorized officer:**

Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____          _____
Date          Notary Public

---

| Sheriff's Fees | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary | |
| Supplemental Surcharge | $_____10.00_____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

OSCA (2-2017) SM30 (JAKSMCC) *For Court Use Only:* **Document Id # 17-SMCC-9404**   1  of  1 Civil Procedure Form No. 1, Rules 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

Case 4:17-cv-00858-HFS   Document 1-1   Filed 10/11/17   Page 8 of 69

## SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made. Thank you.

Circuit Court of Jackson County

 IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI



| Judge or Division:<br>BRYAN E ROUND | Case Number: 1716-CV21481 | |
|---|---|---|
| Plaintiff/Petitioner:<br>STANDARD SHEET METAL, INC.<br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>HEATHER F SHORE<br>2323 GRAND BOULEVARD<br>STE. 1100<br>KANSAS CITY, MO 64108 | |
| Defendant/Respondent:<br>P1 GROUP, INC.<br>Nature of Suit:<br>CC Other Tort | Court Address:<br>415 E 12th<br>KANSAS CITY, MO 64106 | (Date File Stamp) |

## Summons in Civil Case

The State of Missouri to: TED SUPPLEE

Alias:

120 S. ROSEHILL ROAD
LONE JACK, MO 64070

# PRIVATE PROCESS SERVER



*COURT SEAL OF*

*JACKSON COUNTY*

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

08-SEP-2017
Date

_____
Clerk

Further Information:

### Sheriff's or Server's Return

Note to serving officer: Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by: (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____ (title).

☐ other _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

| _____<br>Printed Name of Sheriff or Server | _____<br>Signature of Sheriff or Server |
|---|---|

Must be sworn before a notary public if not served by an authorized officer:

*(Seal)*

Subscribed and sworn to before me on _____ (date).

My commission expires: _____
Date

_____
Notary Public

| Sheriff's Fees | | |
|---|---|---|
| Summons | $ _____ | |
| Non Est | $ _____ | |
| Sheriff's Deputy Salary | | |
| Supplemental Surcharge | $ 10.00 | |
| Mileage | $ _____ | ( _____ miles @ $ _____ per mile) |
| Total | $ _____ | |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

Case 4:17-cv-00858-HFS   Document 1-1   Filed 10/11/17   Page 10 of 69

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.

Circuit Court of Jackson County

Electronically Filed - Jackson - Kansas City - September 01, 2017 - 06:14 PM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**

| | |
|---|---|
| **STANDARD SHEET METAL, INC.,**<br>405 N. Olive Street<br>Kansas City, Missouri 64120<br><br>Plaintiff,<br><br>v.<br><br>**P1 GROUP, INC.,**<br>Serve:  Registered Agent<br>C T Corporation System<br>120 South Central Avenue<br>Clayton, Missouri 63105<br><br>**ALLEN SUPPLEE,**<br>2319 N.E. Springbrook<br>Blue Springs, Missouri 64014<br><br>**SMITTY BELCHER,**<br>2000 Palmer Court<br>Lawrence, Kansas 66047<br><br>**BRUCE BELCHER,**<br>1711 E. 1000 Road<br>Lawrence, Kansas 66049<br><br>**TED SUPPLEE,**<br>120 S. Rosehill Road<br>Lone Jack, Missouri 64070<br><br>Defendants. | Case No. _____<br><br>Div. |

**PETITION**

Plaintiff Standard Sheet Metal, Inc., by and through counsel Brown & Ruprecht, PC, and for its causes of action against Defendants P1 Group, Inc., Allen Supplee, Smitty Belcher, Bruce Belcher, and Ted Supplee, states and alleges as follows:

**Parties**

1.      Standard Sheet Metal, Inc. ("Standard") is a Missouri corporation with its principal place of business in Jackson County, Missouri.

2.  P1 Group, Inc. ("P1 Group") is a Kansas corporation registered to conduct business in the state of Missouri.  P1 Group can be served with process through its Registered Agent CT Corporation System at its Registered Office located at 120 South Central Avenue, Clayton, Missouri 63105.

3.  Allen Supplee is a former Director of Standard.  He is not a minor, incompetent, or in the military, and he can be served with process at his home located at 2319 N.E. Springbrook, Blue Springs, Missouri 64104.

4.  Smitty Belcher is the President and a Director of P1 Group.  He is not a minor, incompetent, or in the military, and he can be served with process at his home located at 2000 Palmer Court, Lawrence, Kansas 66047

5.  Bruce Belcher is a Director of P1 Group.  He is not a minor, incompetent, or in the military, and he can be served with process at his home located at 1711 E. 1000 Road, Lawrence, Kansas 66049.

6.  Ted Supplee is an employee of P1 Group.  He is not a minor, incompetent, or in the military, and he can be served with process at his home located at 120 S. Rosehill Road, Lone Jack, Missouri 64070.

## Jurisdiction and Venue

7.  Missouri has jurisdiction over the parties and over this case because all or part of the torts committed by the Defendants occurred in Missouri, and it was reasonably foreseeable that the Defendants' actions would cause Standard injury in Missouri, which has occurred.

8.  Pursuant to R.S.Mo. § 508.010, venue is proper in this Court because Standard was first injured in Jackson County, Missouri by the torts alleged in this Petition.

## General Allegations

9.      Standard is a small, family-owned business, which provides custom metal fabrication goods and related services on commercial construction projects.

10.      Allen Supplee is the former Director of the Architectural Metals Division at Standard, one of the company's two divisions.

11.      While a Director at Standard, Allen Supplee worked directly for and reported to the company's two officers and owners, Jeff Mann and Shawn Mann.

12.      While at Standard, Allen Supplee was, at all times relevant, responsible for, among other things, marketing and developing the Architectural Metals Division business, formulating bids and proposals, overseeing and directing all services and work provided by the Architectural Metals Division, hiring and firing employees for the Architectural Metals Division, scheduling of projects, and managing a team of Architectural Metals Division employees on construction projects.

13.      At all times relevant, Allen Supplee reported only to Jeff Mann and Shawn Mann while he was at Standard.

14.      At all times relevant, Allen Supplee was provided with an iPhone 7 by Standard, which Standard paid for and which was to be used by Allen Supplee for business purposes in his capacity as a Director of Standard.

15.      At all times relevant, Allen Supplee was provided with a computer in his office at Standard, which Standard paid for and maintained and which was to be used by Allen Supplee for business purposes in his capacity as a Director of Standard.

16.      At all times relevant, Allen Supplee was provided with an email address of asupplee@ssm-kc.com, which Standard assigned to him and paid for, to be used by Allen Supplee for business purposes in his capacity as a Director of Standard.

17.     At all times relevant, Allen Supplee was also provided with an expense account and access to all of Standard's customers and business records pertaining to the Architectural Metals Division, for the sole purpose of client and business development to benefit the company.

18.     Standard entrusted Allen Supplee with these and other key responsibilities pertinent to Standard's business and relating to projects that represented all of Standard's Architectural Metals Division, which was a significant portion of its overall business.

19.     At all times relevant, while Allen Supplee was a Director at Standard, an agreement was formed between himself, Smitty Belcher, Bruce Belcher, and Ted Supplee (collectively, the "Individual Defendants") pursuant to which Allen Supplee would attempt to secure contracts for P1 Group to provide architectural sheet metal materials and labor for projects on which Standard had outstanding bids for that same work.

20.     Allen Supplee acted in furtherance and for the benefit of P1 Group while he was still a Director at Standard, including contacting at least one general contractor and project owner's representative in an effort to secure subcontracts for P1 Group to provide architectural sheet metal materials and labor on projects in which Standard had submitted a bid for that same work.

21.     Among other things, while working for Standard as a Director, Allen Supplee copied key and material information and documentation concerning Standard's business process, practices, procedures, pricing, estimating, analyses, how Standard fabricated parts, etc. relating to the projects on which Standard had submitted a bid to provide architectural sheet metal materials and labor.

22.     On Sunday, May 7, 2017, Allen Supplee tendered his resignation to Standard, effective immediately.

23.     Allen Supplee gave no notice of his resignation before it became effective, even though he knew at least two weeks prior that he would be leaving Standard.

4

24.     Immediately after resigning from Standard, Allen Supplee officially began working for P1 Group.

25.     Upon information and belief, P1 Group has entered into subcontracts to provide architectural sheet metal labor and materials for which Standard had submitted a bid prior to Allen Supplee's resignation, as described in more detail below.

26.     Upon information and belief, P1 Group did not have sufficient equipment and/or manpower resources to fabricate or supply architectural and sheet metal materials prior to its meeting with Allen Supplee to discuss hiring him.

27.     Upon information and belief, P1 Group never performed architectural sheet metal work prior to its hiring of Allen Supplee.

28.     Upon information and belief, P1 Group never submitted bids to fabricate, supply, or install architectural sheet metal materials prior to its hiring of Allen Supplee.

29.     Also, as described in more detail below, one of the main subcontracts that Standard has lost as a result of the Defendants' actions is on the A3 parking garage at Disney World in Florida (the "A3 Garage" or the "A3 Project").

30.     Standard's expected lost profit on the A3 Project is at least $4,029,436.00, which it has now lost as a result of the Defendants' actions.

31.     Acomb Ostendorf & Associates, LLC ("AOA") is acting as the owner's representative for the construction of the A3 Garage, and Finfrock Construction, Inc. ("Finfrock") is the general contractor.

**The Individual Defendants begin discussions to steal projects and business from Standard and for the benefit of P1 Group.**

32.     There were at least 18 phone calls between Allen Supplee and either Smitty Belcher or Bruce Belcher during the last two months Allen Supplee was with Standard—most of which occurred in the final weeks of Allen Supplee's tenure at Standard.

5

33.    There were at least 43 phone calls between Allen Supplee and Ted Supplee during the last two months Allen Supplee was with Standard.

34.    Ted Supplee is a former employee of Standard who was terminated for time theft and performance issues.

35.    For over a year and at all times relevant hereto, Ted Supplee has been an employee of P1 Group.

36.    There were four phone calls between Allen Supplee and Bruce Belcher on March 9, 2017.

37.    Rob Hale is an employee of AOA, and he is Standard's primary contact at AOA.

38.    At 1:07 p.m. on Monday, March 13, 2017, Allen Supplee called Rob Hale, and the two spoke for 16 minutes.

39.    At 2:50 p.m. on Monday, March 13, 2017, Allen Supplee called Ted Supplee, and the two spoke for 29 minutes.

40.    Upon information and belief, Allen Supplee talked to Rob Hale on March 13, 2017 about P1 Group stealing the architectural sheet metal fabrication and installation work Standard had bid for on the A3 Project and/or other projects for which Standard had an outstanding bid.

41.    Ron Heinkel is an employee of Finfrock, and he was Standard's primary contact at Finfrock.

42.    At 3:21 p.m. on Friday, March 31, 2017, Allen Supplee had a 12-minute phone call with Ron Heinkel.

43.    At 3:33 p.m. on Friday, March 31, 2017, Allen Supplee spoke on the phone with Ted Supplee for 12 minutes.

44.    Upon information and belief, Allen Supplee talked to Ron Heinkel on March 31, 2017 about P1 Group stealing the architectural sheet metal fabrication and installation work

Standard had bid for on the A3 Project and/or other projects for which Standard had an outstanding bid.

**Allen Supplee requests meetings with AOA executives during the week of April 17, 2017, to discuss P1 Group getting jobs such as the A3 Project.**

45.     On April 12, 2017, Allen Supplee sent multiple emails to AOA to request meetings between himself and representatives of AOA, including its executives, during the week of April 17, 2017 in Florida.

46.     Allen Supplee stated that the purpose of these meetings was to review matters pertaining to the construction of the A3 Garage.

47.     One of the scheduled meetings during the week of April 17, 2017, was between Allen Supplee and Tom Acomb.

48.     Upon information and belief, at all times relevant, Tom Acomb and Mike Ostendorf are AOA's two managing principals.

49.     Upon information and belief, Allen Supplee did meet with Tom Acomb during the week of April 17, 2017.

50.     Allen Supplee billed Standard for all of his expenses relating to the meeting with AOA during the week of April 17, 2017, while he was still a Director at Standard, including all charges for airfare, hotel, food, and beverage.

51.     Also on April 12, 2017, Allen Supplee spoke on the phone to Mike Ostendorf for 13 minutes.

52.     During the evening of April 12, 2017, Allen Supplee called Ted Supplee, and the two spoke for 7 minutes.

53.     Upon information and belief, before resigning from Standard, Allen Supplee spoke with both Tom Acomb and Mike Ostendorf about P1 Group stealing the architectural sheet metal fabrication and installation work Standard had bid for on the A3 Project.

7

54.     Upon information and belief, before resigning from Standard, Allen Supplee also spoke with both Tom Acomb and Mike Ostendorf about P1 Group stealing the architectural sheet metal fabrication and installation work Standard had bid for on at least one other project.

55.     Between 4:40 p.m. on Friday, April 14, 2017 and 11:02 p.m. on Easter Sunday, April 16, 2017—the weekend before the Florida meetings Allen Supplee requested with AOA executives—Allen Supplee had five phone conversations with Ted Supplee and two phone conversations with Bruce Belcher.

56.     Allen Supplee spoke on the phone with Bruce Belcher and Ted Supplee on Easter Sunday, April 16, 2017.

57.     Upon information and belief, on April 20, 2017, notice was scheduled to be sent to the general contractor to notify it that it had submitted the winning bid and thus had been selected to perform the work on the A3 Project.

58.     Upon information and belief, Allen Supplee learned on April 20, 2017 that Finfrock would be the general contractor on the A3 Project.

59.     Finfrock had relied on Standard's bid documentation and information in order to obtain the winning bid on the A3 Project.

60.     On April 20, 2017 at 10:06 a.m. Allen Supplee spoke to Bruce Belcher on the phone.

61.     While in his office at Standard, on April 20, 2017, Allen Supplee performed Google searches on his Standard-issued computer for "retirement calculator" and "estimated social security benefit."

62.     At or about 1:00 p.m. on April 20, 2017, Allen Supplee sent a text message to Bruce Belcher stating: "Bruce just checking to see if you received my message.  If you could let me know if Saturday AM is good if not I need to schedule something else thank you."

8

63.     At 10:24 p.m. on Saturday, April 22, 2017, Allen Supplee sent a text message to Smitty Belcher stating:

> Smitty it was my pleasure
> Thank you for the opportunity
> I am sure that I will make the right decision
> I just need to make a few phone calls and get my head wrapped around what is best
> We will talk again soon

**In the days surrounding April 24, 2017, there is a flood of activity by Allen Supplee on behalf of P1 Group.**

64.     On Sunday, April 23, 2017, Allen Supplee had two phone conversations with Smitty Belcher—one lasting 8 minutes and the other 23 minutes.

65.     On April 23, 2017, Allen Supplee also had a 17-minute phone call with Ted Supplee.

66.     On April 23, 2017, Allen Supplee sent a text message to two unknown numbers stating "If there is any way you guys can call me on a conference call I need to speak to both of you at the same time."

67.     Upon information and belief, the text message referenced in the previous paragraph was sent to representatives of AOA.

68.     Upon information and belief, Allen Supplee and representatives from AOA had a conference call on or after April 23, 2017 to discuss P1 Group stealing the architectural sheet metal fabrication and installation work that Standard bid for on the A3 Project, and other work that Standard had bid for on other projects.

69.     Between 9:29 p.m. and 9:55 p.m. on Sunday, April 23, 2017, several text messages were exchanged between Allen Supplee, and AOA managing principals, Tom Acomb and Mike Ostendorf.

70.     Approximately 8 hours later at 6:04 a.m. on Monday, April 24, 2017, Mike Ostendorf from AOA called Allen Supplee, and the two spoke for 10 minutes.

71.     Immediately thereafter between 6:16 a.m. and 6:27 a.m. on Monday, April 24, 2017, Allen Supplee exchanged multiple text messages with Smitty Belcher and Bruce Belcher.

72.     Allen Supplee deleted all of these text messages from his Standard-issued iPhone before resigning from Standard on May 7, 2017.

73.     Upon information and belief, Tom Acomb and Mike Ostendorf agreed that AOA would influence Finfrock to award the architectural metal subcontract on the A3 Project to P1 Group in text messages from April 23, 2017 and in the call between Allen Supplee and Mike Ostendorf the next morning, and Allen Supplee informed Smitty Belcher and Bruce Belcher of this in text messages on April 24, 2017.

74.     At 6:52 a.m. on April 24, 2017, Allen Supplee began performing internet searches from his Standard-issued computer for "how to determine your income tax bracket."

75.     On April 24, 2017 at 7:01 a.m., Mike Ostendorf sent an email to Allen Supplee on his Standard-issued computer, which stated "Assuming this may go on hold per our conversation this am? Let's talk this week more" in response to an email from Allen Supplee the previous week inviting AOA executives Mike Ostendorf and Tom Acomb to Kansas City to tour Standard's facilities and attend a Royals game.

76.     Every single one of the aforementioned text messages and phone calls to or from Allen Supplee were made or received on Allen Supplee's Standard-issued iPhone.

**Within hours of the 6:04 a.m. phone call with Mike Ostendorf, Allen Supplee begins misappropriating Standard's electronic files.**

77.     Unbeknownst to Standard and without Standard's authorization, at 9:43 a.m. on April 24, 2017, a thumb drive was connected into Allen Supplee's Standard-issued computer.

78.     Unbeknownst to Standard and without Standard's authorization, Allen Supplee copied information from Standard's computer system on the morning of April 24, 2017 onto at least one flash drive.

79.     Additional materials, files, data and information were taken by Allen Supplee from Standard, without Standard's knowledge or authorization.

80.     On May 9, 2017, two days after Allen Supplee's resignation, Standard sent a letter to Allen Supplee and P1 Group that demanded, among other things, the return of all the files taken by Allen Supplee from Standard.

81.     P1 Group and Allen Supplee were instructed, in this letter, to not retain copies of any documents or of any information that Allen Supplee had taken from Standard.

82.     It was represented to Standard that P1 Group and Allen Supplee would comply with Standard's request.

83.     Subsequently, P1 Group and/or Allen Supplee caused to be returned to Standard the exact same thumb drive that had been connected to Allen Supplee's computer on the morning of April 24, 2017, along with paper files and a second thumb drive (collectively, the "Misappropriated Files").

84.     P1 Group and Allen Supplee represented to Standard that the Misappropriated Files contained all of the information and files Allen Supplee took from Standard.

85.     The second thumb drive with Misappropriated Files was last connected to the computer Allen Supplee used while he was at Standard on Friday, May 5, 2017, *i.e.*, the last day Allen Supplee was in Standard's office.

86.     The Misappropriated Files were not "working files" that Allen Supplee happened to still have in his possession when he left Standard.

87.     Also on April 24, 2017 at 10:59 a.m., another thumb drive (the "Missing Thumb Drive") was connected to the computer Allen Supplee used while he was at Standard.

88.     The Missing Thumb Drive contains files that Standard demanded Allen Supplee and P1 Group return to Standard in the May 9, 2017 letter.

89.     However, the Missing Thumb Drive was not one of the two thumb drives returned by Allen Supplee and P1 Group to Standard as part of the Misappropriated Files.

90.     Upon information and belief, Allen Supplee also uploaded Standard's confidential and proprietary files to a Dropbox account for use by the Defendants in furtherance of P1 Group, without Standard's knowledge or permission.

91.     Upon information and belief, those materials Allen Supplee uploaded to Dropbox also were not returned to Standard as part of the Misappropriated Files.

**After misappropriating Standard's files on April 24, 2017, a flurry of communications through the rest of the week leave zero doubt that Allen Supplee was sabotaging Standard's business in favor of P1 Group.**

92.     At 11:03 a.m. on Monday, April 24, 2017, Allen Supplee called Ted Supplee, and the two talked for 16 minutes.

93.     Throughout the afternoon of Monday, April 24, 2017, Allen Supplee had at least 8 more phone calls with Mike Ostendorf, Smitty Belcher, and Ted Supplee.

94.     During the rest of the week of April 24, 2017, there were at least 24 further phone calls involving Allen Supplee and the following individuals: Ron Heinkel with Finfrock; Mike Ostendorf and Tom Acomb with AOA; and Smitty Belcher, Bruce Belcher, and Ted Supplee with P1 Group.

95.     These calls were all made from Allen Supplee's Standard-issued iPhone.

96.     There were also numerous text messages sent and received during the week of April 24, 2017 that Allen Supplee deleted from his Standard-issued iPhone, including text messages with Ron Heinkel, Smitty Belcher, Bruce Belcher, and Ted Supplee.

97.     During the week of May 1, 2017, there were multiple phone calls and at least one text message between Allen Supplee and AOA representatives Tom Acomb and Rob Hale, including a 31-minute phone conversation with Rob Hale at 7:50 p.m. on May 2, 2017.

98.     Upon information and belief, Allen Supplee communicated on behalf and in furtherance of P1 Group during phone calls with Tom Acomb and Rob Hale during the week of May 1, 2017.

99.     Upon information and belief, P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee knew, approved, directed, and/or controlled Allen Supplee's actions in trying to secure the subcontracts on the A3 Project and others for P1 Group while Allen Supplee was still a Director at Standard.

100.    Upon information and belief, before Allen Supplee took a position with P1 Group, the company did not have an architectural metals operation, or the machinery necessary for architectural metal projects.

101.    During his last week at Standard, Allen Supplee shopped online during work hours on his Standard-issued computer for the machinery and other equipment necessary for architectural metals fabrication.

102.    Upon information and belief, Allen Supplee's shopping for such machinery and other equipment was for the benefit of P1 Group's new architectural sheet metal business.

**Allen Supplee destroys evidence to conceal his work on behalf of P1 Group while still a Director at Standard.**

103.    In the last week before Allen Supplee resigned, he performed an internet search on his Standard-issued computer to determine "how to clear recent document lists from Excel."

104.    After Allen Supplee resigned, Standard caused to be examined the computer Allen Supplee used at Standard, and the list of recently opened Excel files had been cleared.

105.    Allen Supplee deleted the list of recently opened Excel files to conceal his activities on behalf of P1 Group, before he resigned from Standard.

106.     Also in the last week before he resigned, Allen Supplee performed an internet search on his Standard-issued computer for "how to clear multiple contacts at once from Iphone-7."

107.     Allen Supplee's last day at Standard's office was Friday, May 5, 2017, and that day he left his Standard-issued iPhone at Standard.

108.     Allen Supplee deleted all of the contacts from his Standard-issued iPhone before leaving the office on Friday, May 5, 2017.

109.     The contacts on Allen Supplee's Standard-issued iPhone included, but were not limited to, business contacts that were added and/or developed while Allen Supplee was a Director of Standard.

110.     Also before leaving the office on Friday, May 5, 2017, Allen Supplee deleted all of the text messages from his Standard-issued iPhone.

111.     Standard was able to recover some, but not all, of the text messages that Allen Supplee deleted from his Standard-issued iPhone.

**P1 Group and Allen Supplee refuse to comply with Standard's demand that they not compete against Standard on jobs in which it had an outstanding bid when Allen Supplee resigned.**

112.     On May 9, 2017, two days after Allen Supplee's resignation, Standard sent P1 Group and Allen Supplee a letter demanding that they provide written assurance that they will not try to obtain architectural sheet metal subcontracts on projects for which Standard had an outstanding bid when Allen Supplee resigned.

113.     P1 Group received the May 9, 2017 correspondence.

114.     In a May 17, 2017 letter, P1 Group and Allen Supplee stated that they were free to compete against Standard.

14

115. The May 17, 2017 letter did, however, "assure [Standard] that neither P1 Group nor Mr. Supplee will encourage or induce any person or entity to breach any binding contract with Standard."

116. As described in more detail below, multiple projects on which Standard had an outstanding bid on the date Allen Supplee resigned were located at Disney World and Disneyland.

117. The May 17, 2017 letter asserted that "Allen Supplee has been engaged in Disney-related projects for the past twenty-two years, long before he started working for Standard."

118. Upon information and belief, before joining Standard, Allen Supplee only worked on a small handful of projects related to Disney in his entire career—with the last one being in 2003.

119. Upon information and belief, before joining Standard, Allen Supplee never worked on a single project with AOA.

120. Upon information and belief, Allen Supplee had also never worked on a single project with Finfrock before resigning from Standard on May 7, 2017.

**The Misappropriated Files include valuable information, the confidentiality and secrecy of which Standard took reasonable steps to protect.**

121. Before his resignation from Standard, Allen Supplee copied among other documents certain Misappropriated Files from Standard's computer system onto at least two thumb drives, and he took hard copies of certain Misappropriated Files from Standard.

122. Allen Supplee retained the Misappropriated Files after he left Standard.

123. The Misappropriated Files contained information and data relevant to outstanding bids Standard had submitted on several projects.

124. The Misappropriated Files contained information that Standard had prepared, compiled, and developed over the course of several years, for the purpose of winning contracts relating to architectural sheet metal materials and labor for various construction projects.

125.     Standard did not authorize Allen Supplee to copy and retain any files from its computer system for use in furtherance of or to share with P1 Group.

126.     Standard took reasonable steps to ensure the confidentiality of the Misappropriated Files.

127.     Allen Supplee executed a document acknowledging receipt of Standard's employee handbook (the "Handbook").

128.     The Handbook contains the following paragraph:

Employees will often have access to confidential financial, product and strategic business information about [Standard].  Any company's success can be seriously compromised by the inappropriate disclosure of confidential information.  The obligation to protect such information applies to each person while employed by [Standard] and after leaving employment with [Standard].  Confidential information includes, but is not limited to, trade secrets or other confidential information relating to products, processes, know-how, customers, suppliers, designs, drawings, formulas, test data, marketing data, accounting and financial information, pricing or salary information, business plans and strategies, negotiations and contracts, inventions and discoveries.

129.     The Handbook also states that employees "should only share information with other [Standard] employees when there is a good business reason to do so."

130.     The Handbook goes on to warn that "[c]onfidential information should not be disclosed to any outside party unless the disclosure is approved by an authorized member of management."

131.     The Handbook further provides that "[e]mployees are prohibited from using [Standard] property or personnel for personal matters outside the scope of his/her employment."

132.     Other provisions of the Handbook make it clear that Allen Supplee was not authorized to copy and/or disclose Standard's files for the benefit of any third party, including P1 Group.

**P1 Group obtains a subcontract for the A3 Garage immediately after Allen Supplee resigns from Standard.**

133.    Between 2014 and 2017, Standard performed architectural sheet metal work on the A1 and A2 parking garages at Disney World in Florida (the "A1 Garage" and the "A2 Garage").

134.    Standard's work on the A1 and A2 Garages was successful and profitable, and the owner's representative on these projects, AOA, was pleased with Standard's work.

135.    The A1 and A2 Garages are nearly identical to the planned A3 Garage, with each project containing the same four architectural sheet metal components: vertical tubes, horizontal louvers, corner planters, and checkered louvers.

136.    The A3 Garage will also be located at Disney World in Florida, and it will be constructed near the A1 and A2 Garages.

137.    Standard earned profits on the A1 Garage and on the A2 Garage.

138.    After having constructed the A1 Garage, Standard's profit margins increased on the A2 Garage.

139.    If Standard's work on the A3 Garage had the same profit margins as the A2 Garage, then Standard would have made a profit of $4,029,436.00 on the A3 Garage.

140.    When AOA sent out requests for proposals to general contractors on the A3 Garage, it included details, drawings, and calculations that Standard had prepared and provided to AOA - at no charge (the "Design Assist Services"), even though Standard incurred significant expense in preparing those documents.

141.    The Design Assist Services provided by Standard free of charge are valued at approximately $185,000.

142.    Standard provided the Design Assist Services free of charge for the purpose of marketing Standard's ability to design architectural sheet metal documents and with the understanding it was to obtain a subcontract on the A3 Garage.

143. At all times relevant, Allen Supplee was aware that Standard had provided the Design Assist Services free of charge and for the purpose of marketing Standard's ability to design architectural sheet metal documents and with the understanding it would obtain the A3 Garage work.

144. Standard's logo was on the details, drawings, and calculations that were the product of the Design Assist Services, and any third party reviewing them would know that Standard had been involved in their preparation.

145. The requests for proposals to general contractors that AOA sent out for construction of the A3 Garage also stated that artificial plants would be incorporated throughout the façade of the A3 Garage and required that the plants be purchased directly from Standard, regardless of which subcontractor the general contractor ultimately subcontracted with to provide the architectural sheet metal work on the A3 Garage.

146. Three general contractors, including Finfrock, submitted bids for the A3 Project, and all three relied upon Standard's subcontractor bid for the architectural sheet metal fabrication and work.

147. Upon information and belief, P1 Group did not bid for the architectural sheet metal work on the A3 Project before the general contractors submitted their bids for consideration by the owner and/or AOA.

148. Upon information and belief, only one other subcontractor bid against Standard for the architectural sheet metal work at the A3 Garage, and that bid was significantly higher than Standard's.

149. Allen Supplee advised Standard that, based on his communications with representatives of AOA, Standard would be awarded the architectural sheet metal subcontract on the A3 Project.

150.    By early April 2017, Finfrock had sent Standard a subcontract to provide the entire scope of work for the architectural sheet metal fabrication and installation on the A3 Project, so that it could be quickly executed in the event Finfrock was selected as the general contractor.

151.    Notice was scheduled to be sent out on April 20, 2017 to the general contractor that was selected to construct the A3 Project.

152.    On April 3, 2017, Kathryn Maluda from Finrock sent Standard a copy of the planned schedule for construction of the A3 Garage.

153.     Allen Supplee responded that, in order to meet Finfock's proposed schedule, Standard would need to commence preparation of the engineering plans for the architectural sheet metal components by April 20, 2017—the same day the general contractor was scheduled to be chosen.

154.    In response, on April 3, 2017, Kathryn Maluda asked Allen Supplee if Standard would move forward with developing the engineering plans on April 20, 2017 if Finfrock provided a letter confirming its intent to engage Standard to provide the architectural sheet metals work on the A3 Project.

155.     Allen Supplee responded that Standard would begin work on the engineering plans with such a letter of intent.

156.    Finfrock won the bid for construction of the A3 Project on or about April 20, 2017.

157.    On that same day, April 20, 2017, Standard expected that it would receive a letter of intent from Finfrock confirming Standard had been selected to perform the architectural sheet metal work on the A3 Garage, as it had promised.

158.    But Finfrock never sent Standard the letter of intent.

159.    Instead, Finfrock awarded the architectural sheet metal subcontract on the A3 Project to P1 Group immediately after Allen Supplee began working there.

Electronically Filed - Jackson - Kansas City - September 01, 2017 - 06:14 PM

160.    While he was still at Standard, Allen Supplee sent the following text message from his Standard-issued iPhone: "Bruce Belcher with P1 will be sending you the same package of information he is sending Finfrock."

161.    Upon information and belief, when Allen Supplee left Standard he took with him a copy of Standard's engineering files that Standard created and paid for, including shop drawings and autocad part drawings of all components and subcomponents, relating to the architectural sheet metal work on the A2 Garage.

162.    Standard spent $184,073.00 to create and develop the engineering files for the A2 Garage.

163.    At all times relevant hereto, Allen Supplee knew or reasonably should have known how much Standard spent to create and develop the engineering files for the A2 Garage.

164.    Because the two projects are substantially similar, the engineering files for the A2 Garage could be used as a template to create the engineering files for all parts required on the A3 Garage.  The equipment P1 Group purchased is identical to Standard's equipment which would allow for exact replication utilizing Standard's engineering files.

165.    Having the A2 Garage engineering files significantly reduces the time, effort, and cost necessary to create the engineering files for the A3 Garage.

166.    The Misappropriated Files included Standard's actual bid on the A3 Project, which stated the dollar amount of that bid.

167.    The Misappropriated Files also included a 68-page estimate of all of the costs, labor, and materials for the architectural sheet metal work on the A3 Garage, which Standard used in formulating its bid on the A3 Project.

168.    The Misappropriated Files further included design concepts and sketches for the A3 Garage that Standard prepared to aid in the development of its bid.

169.    Also a part of the Misappropriated Files was Standard's take-off information for the A3 Project.

170.    The take-off information broke down the A3 Project into elements, which are then broken down into parts and pieces.  The take-off information can be used to determine what materials are required for the A3 Project, the overall cost, scheduling of all of the work that needs to be done, and how many shop, field, and engineering hours it will take to complete the A3 Project.

171.    Upon information and belief, the Defendants used the Misappropriated Files, the take-off information, and Allen Supplee's knowledge of Standard's bid, which he gained while serving as a Director of Standard, on the A3 Project to assist P1 Group with obtaining the architectural sheet metal subcontract for the A3 Project.

**P1 Group also steals a subcontract for a parking garage in Boca Raton, Florida from Standard.**

172.    On or about February 8, 2017, Standard submitted a bid to Finfrock to provide labor and materials related to the fabrication and installation of architectural sheet metal components for a parking garage in Boca Raton, Florida (the "Boca Raton Garage" or the "Boca Raton Project").

173.    Based on its bid, Standard estimated that it would have earned a profit of at least $493,484.00 from the Boca Raton Project.

174.    Finfrock indicated to Standard it would receive a subcontract for the Boca Raton Project.

175.    Allen Supplee scheduled Standard's engineering department to begin required shop drawings for the Boca Raton Project on June 5, 2017.

176.    The deadline to submit a bid to provide labor and materials related to the aluminum elements on the Boca Raton Garage was before Allen Supplee resigned from Standard on May 7, 2017.

21

177.    Upon information and belief, Allen Supplee informed Finfrock that he would be leaving Standard.

178.    Upon information and belief, P1 Group did not submit a bid to provide labor and materials related to the architectural sheet metal work on the Boca Raton Garage prior to the bid deadline.

179.    Since May 7, 2017, Finfrock has not responded to Standard's attempts to inquire about the Boca Raton Garage.

180.    Upon information and belief, P1 Group has been awarded a subcontract relating to the architectural sheet metal work on the Boca Raton Garage.

181.    Included in the Misappropriated Files taken by Allen Supplee from Standard was the bid Standard submitted for the Boca Raton Garage, which stated the dollar amount of the bid.

182.    Also included in the Misappropriated Files were estimates of all of the costs, labor, and materials for the fabrication and other work to be done by Standard on the Boca Raton Garage, which Standard used in formulating its bid for the Boca Raton Garage.

183.    The Misappropriated Files further included design concepts and sketches for the Boca Raton Garage that Standard prepared to aid in the development of its bid.

184.    Also a part of the Misappropriated Files was the only copy of Standard's take-off information for the Boca Raton Project, which Standard creates on paper and which is not saved electronically.

185.    The take-off information broke down the Boca Raton Project into elements, which are then broken down into parts and pieces.  The take-off information can be used to determine what materials are required for the Boca Raton Project, the overall cost, scheduling of all of the work that needs to be done, the design concepts that the estimates for the job are based on, and how many shop, field, and engineering hours it will take to complete the Boca Raton Project.

186.     Upon information and belief, the Defendants used the Misappropriated Files, the take-off information, and Allen Supplee's knowledge of Standard's bid on the Boca Raton Project, which he gained while serving as a Director of Standard, to assist P1 Group with obtaining the architectural sheet metal subcontract for the Boca Raton Project.

187.     Allen Supplee did not correspond with any Finfrock employees regarding the Boca Raton Project after March 28, 2017, via his Standard-issued computer or his Standard-issued email account.

188.     Upon information and belief, Allen Supplee corresponded on behalf of P1 Group with Finfrock employees after March 28, 2017 regarding the Boca Raton Project via his personal email address, while he was still a Director of Standard.

189.     Allen Supplee scheduled Standard's engineering department to begin required shop drawings for the Boca Raton Project on June 5, 2017, and he scheduled modeling to begin on July 10, 2017.

**Without submitting a bid, P1 Group obtains a subcontract related to the construction of Alcatraz at Disney World and Disneyland.**

190.     On or about February 16, 2017, Standard submitted a bid to AOA to provide labor and materials related to a project known as Alcatraz for Disney World in Florida and Disneyland in California (the "Alcatraz Project").

191.     Based on its bid, Standard estimated that it would have earned a profit of at least $158,701.00 from the Alcatraz Project.

192.     AOA indicated that Standard would be awarded a subcontract to fabricate and provide labor and materials related to the Alcatraz Project, consistent with the terms of Standard's February 16, 2017 bid.

193.     Around April 17, 2017, Allen Supplee was informed that Standard had been given approval by AOA to begin design work on the Alcatraz Project.

23

194.    Around that same day, April 17, 2017 Allen Supplee was informed that AOA would sending a subcontract to Standard for the Alcatraz Project.

195.    Allen Supplee informed AOA that he would be leaving Standard.

196.    Since May 7, 2017, AOA has not responded to Standard's attempts to inquire about the Alcatraz Project.

197.    Upon information and belief, P1 Group did not submit a bid to provide labor and materials related to the Alcatraz Project before the bid deadline.

198.    Upon information and belief, P1 Group has been awarded a subcontract for the Alcatraz Project.

199.    Included in the Misappropriated Files taken by Allen Supplee from Standard was the bid Standard submitted on the Alcatraz Project, which stated the dollar amount of the bid.

200.    Also included in the Misappropriated Files were estimates of all of the costs, labor, and materials for the fabrication and other work to be done by Standard on the Alcatraz Project, which Standard used in formulating its bid on the Alcatraz Project.

201.    The Misappropriated Files further included design concepts and sketches for the Alcatraz Project that Standard prepared to aid in the development of its bid.

202.    Upon information and belief, Allen Supplee took Standard's only copy of its take-off information for the Alcatraz Project, which Standard creates on paper and which is not saved electronically.

203.    Only some of Standard's take-off information for the Alcatraz Project was returned as part of the Misappropriated Files.

204.    The take-off information broke down the Alcatraz Project into elements, which are then broken down into parts and pieces. The take-off information can be used to determine what materials are required for the Alcatraz Project, the overall cost, scheduling of all of the work that

24

needs to be done, and how many shop, field, and engineering hours it will take to complete the Alcatraz Project.

205.     Upon information and belief, the Defendants used the Misappropriated Files, the take-off information, and Allen Supplee's knowledge of Standard's bid on the Alcatraz Project, which he gained while serving as a Director for Standard, to help P1 Group in obtaining a subcontract for the Alcatraz Project.

**P1 Group obtains a subcontract on a parking garage in Michigan, instead of Standard, because of the Defendants' actions.**

206.     On or about March 29, 2017, Standard submitted a bid to Finfrock to provide labor and materials related to architectural sheet metal on a parking garage in Troy, Michigan (the "Michigan Garage" or the "Michigan Project").

207.     Based on its bid, Standard estimated that it would have earned a profit of at least $109,585.00 from the Michigan Project.

208.     Upon information and belief, the deadline to submit a bid to provide labor and materials related to architectural sheet metal the Michigan Garage was before Allen Supplee resigned from Standard on May 7, 2017.

209.     Upon information and belief, P1 Group did not submit a bid to provide labor and materials related to the Michigan Garage prior to the bid deadline.

210.     Again, Allen Supplee informed Frinfrock he was leaving Standard.

211.     Since May 7, 2017, Finfrock has not responded to Standard's attempts to inquire about the Michigan Project.

212.     Upon information and belief, P1 Group has been awarded a subcontract on the Michigan Garage.

213.     Included in the Misappropriated Files taken by Allen Supplee from Standard was the bid Standard submitted for the Michigan Garage, which stated the dollar amount of the bid.

25

214. Also included in the Misappropriated Files were estimates of all of the costs, labor, and materials for the architectural sheet metal fabrication and other work to be done by Standard on the Michigan Garage, which Standard used in formulating its bid on the Michigan Garage.

215. The Misappropriated Files further included design concepts and sketches for the Michigan Garage that Standard prepared to aid in the development of its bid.

216. Upon information and belief, Allen Supplee took Standard's only copy of its take-off information for the Michigan Project, which Standard creates on paper and which is not saved electronically.

217. Only some of Standard's take-off information for the Michigan Project was returned as part of the Misappropriated Files.

218. The take-off information broke down the Michigan Project into elements, which are then broken down into parts and pieces. The take-off information can be used to determine what materials are required for the Michigan Project, the overall cost, scheduling of all of the work that needs to be done, and how many shop, field, and engineering hours it will take to complete the Michigan Project.

219. Upon information and belief, the Defendants used the Misappropriated Files, the take-off information, and Allen Supplee's knowledge of Standard's bid on the Michigan Project, which he gained while serving as a Director of Standard, to assist P1 Group with obtaining a subcontract on the Michigan Project.

220. Allen Supplee did not correspond with any Finfrock employees regarding the Michigan Project after March 30, 2017, via Standard-issued email account.

221. Upon information and belief, Allen Supplee corresponded on behalf of P1 Group with Finfrock employees after March 30, 2017 regarding the Michigan Project via a personal email address, while he was a Director of Standard.

Electronically Filed - Jackson - Kansas City - September 01, 2017 - 06:14 PM

222.    At all times relevant to this Petition, P1 Group consented, expressly or impliedly, to the Individual Defendants' acting on P1 Group's behalf, and the Individual Defendants were subject to P1 Group's control.

223.    All conditions precedent were met prior to the filing of this Petition.

**Count I**
**Tortious Interference with Business Expectancy**

224.    Standard incorporates paragraphs 1 through 223 of its Petition, as if fully set forth herein.

225.    Standard had valid business expectancies with the probability of future economic benefit on the A3 Project, the Alcatraz Project, the Boca Raton Project, and the Michigan Project (collectively, the "Outstanding Projects").

226.    For instance, on the A3 Project, Standard performed the Design Assist Services for AOA that had a value of approximately $185,000.00 based on the understanding that it would be awarded the architectural sheet metal subcontract for the A3 Project, Standard had performed well in providing the architectural sheet metal work on the A1 and A2 Garages which were substantially similar to the A3 Garage, each general contractor had used and relied upon Standard's bid in calculating its own bid for construction of the A3 Project, and the winning general contractor, Finfrock, indicated that it would issue a letter of intent to Standard, confirming it would receive a subcontract on the A3 Project, so that Standard would commence work on engineering plans for the A3 Project.

227.    At all times relevant hereto, the Defendants had knowledge of Standard's business expectancies.

228.    The Defendants intentionally interfered with Standard's business expectancies by, among other things, inducing or causing breaches of Standard's business relationships, *i.e.*, by obtaining subcontracts for P1 Group that were valid business expectancies of Standard.

27

229.    The Defendants' actions lack justification because they have employed improper means in interfering with Standard's business expectancies, by among other things, breaching duties owed to Standard, misappropriating Standard's trade secrets, converting Standard's work product, misappropriating Standard's sensitive financial and estimating information, converting Standard's engineering and shop drawings, and tampering with Standard's computers.

230.    Each of the Individual Defendants interfered with Standard's business expectancies on the Outstanding Projects for or on behalf of P1 Group, with P1 Group's consent to acting on its behalf, and while the Individual Defendants were subject to P1 Group's control.

231.    Standard incurred damages that include, but are not limited to, lost profits as a direct and proximate result of the Defendants' interference with Standard's business expectancies.

232.    Because of the Defendants' interference with Standard's business expectancy on the A3 Project, Standard has suffered damages, including, but not limited to, lost profits of not less than $4,029,436.00.

233.    Because of the Defendants' interference with Standard's business expectancy on the A3 Project, Standard has suffered other damages in an amount to be proven at trial.

234.    Upon information and belief, because of the Defendants' interference with Standard's business expectancies on all of the Outstanding Projects, Standard has suffered damages, including but not limited to, its lost profits of not less than $4,791,206.00.

235.    Because of the Defendants' interference with Standard's business expectancy on all of the Outstanding Projects, Standard has suffered other damages in an amount to be proven at trial.

236.    Upon information and belief, Standard may also lose other business expectancies that the Defendants have interfered with or will interfere with, and therefore its damages from its lost profits may increase.

237.    The Defendants' conduct in interfering with Standard's business expectancies was outrageous.

238.    The Defendants' conduct in interfering with Standard's business expectancies displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against the Defendants, jointly and severally, for fair and reasonable damages incurred because the Defendants have tortiously interfered with Standard's business expectancies in an amount to be proven at trial, including, but not limited to, Standard's lost profits of not less than $4,791,206.00; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

<u>Count II</u>
<u>Conspiracy to Commit</u>
<u>Tortious Interference with Business Expectancy</u>
<u>(Individual Defendants Only)</u>

239.    Standard incorporates paragraphs 1 through 238 of this Petition, as if fully set forth herein.

240.    The Individual Defendants shared the object of tortiously interfering with Standard's business expectancy.

241.    There was a meeting of the minds between all of the Individual Defendants that they would tortiously interfere with Standard's business expectancy by seeking and obtaining subcontracts on the Outstanding Projects for or on behalf of P1 Group, with the use of confidential, financial, sensitive, and/or proprietary information belonging to Standard, including but not limited to the information contained on Standard's bids, that was misappropriated from Standard's computers by Allen Supplee in breach of his fiduciary duties and duty of loyalty owed to Standard.

242.    All Individual Defendants knew that the information Allen Supplee was misappropriating from Standard for use by or on behalf of P1 Group, belonged to Standard.

29

Electronically Filed - Jackson - Kansas City - September 01, 2017 - 06:14 PM

243. The Individual Defendants committed one or more unlawful acts in furtherance of the conspiracy to tortiously interfere with Standard's business expectancies by, among other things, seeking and obtaining subcontracts on one or more Outstanding Projects for or on behalf of P1 Group, with the use of Standard's financial information, engineering and shop drawings, and/or confidential and proprietary information on Standard's bid, that was misappropriated from Standard's computer system by Allen Supplee in breach of his fiduciary duties and duty of loyalty owed to Standard.

244. Standard incurred damages as a direct and proximate result of the Individual Defendants' conspiracy to interfere with Standard's business expectancies which includes, but is not limited to, lost profits.

245. Because of the Individual Defendants' conspiracy to interfere with Standard's business expectancy on the A3 Project, Standard has suffered damages, including, but not limited to, its lost profits of not less than $4,029,436.00.

246. Because of the Individual Defendants' conspiracy to interfere with Standard's business expectancy on the A3 Project, Standard has suffered other damages in an amount to be proven at trial.

247. Upon information and belief, because of the Individual Defendants' conspiracy to interfere with Standard's business expectancies on the Outstanding Projects, Standard has suffered damages, including, but not limited to, its lost profits of not less than $4,791,206.00.

248. Because of the Individual Defendants' conspiracy to interfere with Standard's business expectancy on one or more of the Outstanding Projects, Standard has suffered other damages in an amount to be proven at trial.

249.    Upon information and belief, Standard may also lose other business expectancies that the Individual Defendants have conspired to interfere with, and therefore its damages from its lost profits may increase.

250.    The Individual Defendants' conduct in conspiring to interfere with Standard's business expectancies was outrageous.

251.    The Individual Defendants' conduct in conspiring to interfere with Standard's business expectancies displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against the Individual Defendants, jointly and severally, in the amount of its fair and reasonable damages incurred because the Individual Defendants have conspired to tortiously interfere with Standard's business expectancies, including, but not limited to, Standard's lost profits of not less than $4,791,206.00; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

**Count III**
**Breach of Fiduciary Duties**
**(Allen Supplee Only)**

252.    Standard incorporates paragraphs 1 through 251 of this Petition, as if fully set forth herein.

253.    At all times relevant hereto, Allen Supplee owed and continues to owe Standard fiduciary duties.

254.    Allen Supplee was the Director in charge of one of Standard's two divisions, he managed a substantial number of Standard's employees, he had the authority to hire and fire, develop clients, using company credit cards for business purposes, and he was entrusted with obtaining and managing subcontracts representing a significant portion of Standard's business.

255.     Allen Supplee actively worked against Standard's interests and on behalf of P1 Group, both while he was a Director at Standard and after he left Standard to work for P1 Group.

256.     Allen Supplee contacted AOA and/or Finfrock while he was a Director at Standard in an effort to secure subcontracts on one or more of the Outstanding Projects for or on behalf of P1 Group.

257.     Upon information and belief, Allen Supplee contacted AOA and/or Finfrock in an effort to secure subcontracts on each of the Outstanding Projects for or on behalf of P1 Group, after he left Standard and went to work for P1 Group.

258.     Allen Supplee copied and took Standard's financial and confidential information, including the Misappropriated Files, for himself and others at P1 Group to use in obtaining subcontracts on one or more of the Outstanding Projects.

259.      While he was still a Director at Standard, Allen Supplee shopped for equipment for P1 Group to purchase and use in order for P1 Group to fabricate and punch architectural sheet metal for use on one or more of the Outstanding Projects.

260.     Allen Supplee has usurped for P1 Group the architectural sheet metal subcontract for the A3 Project from Standard, causing Standard damages that include, but are not limited to, its lost profits of not less than $4,029,436.00.

261.     Upon information and belief, Allen Supplee has usurped for P1 Group subcontracts on one or more of the Outstanding Projects, causing Standard damages that include, but are not limited to, its lost profits of not less than $4,791,206.00.

262.     Upon information and belief, Standard may also lose subcontracts on other jobs because of the breaches of Allen Supplee's fiduciary duties owed to Standard, and therefore its damages may increase.

263.    A breach of a fiduciary duty can be remedied in part by requiring the tortfeasor to return compensation paid while he or she was in breach of the fiduciary duty.

264.    Standard paid compensation to Allen Supplee while he was actively and intentionally breaching his fiduciary duties to Standard.

265.    Therefore, Standard was additionally damaged in the amount of compensation provided to Allen Supplee while he was in breach of his fiduciary duties, and it is entitled to reimbursement of those amounts.

266.    Allen Supplee's conduct in breaching his fiduciary duties owed to Standard was outrageous.

267.    Allen Supplee's conduct in breaching his fiduciary duties owed to Standard displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

268.    All of the information, data, files and Misappropriated Files that Allen Supplee took from Standard were taken without Standard's knowledge or permission, and without any consideration or payment for the same.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against Allen Supplee in the amount of its fair and reasonable damages incurred because of his breaches of fiduciary duties which shall be proven at trial, including, but not limited to, Standard's lost profits of not less than $4,791,206.00, and the compensation paid by Standard to Allen Supplee while he was in breach of his fiduciary duties to Standard; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

**Count IV**
**Conspiracy to Breach Fiduciary Duties**
**(Individual Defendants Only)**

269.    Standard incorporates paragraphs 1 through 268 of this Petition, as if fully set forth herein.

33

270.    The Individual Defendants shared the unlawful objective of competing against Standard in breach of the fiduciary duties Allen Supplee owed to Standard.

271.    There was a meeting of the minds between the Individual Defendants that they would compete against Standard by seeking subcontracts for or on behalf of P1 Group for one or more of the Outstanding Projects with the benefit of knowing the amount of Standard's bids, usurping Standard's corporate opportunities, and copying, reviewing, and using financial and confidential information from Standard's computer system without Standard's authorization, including the Misappropriated Files.

272.    The Individual Defendants committed one or more unlawful overt acts by, among other things, seeking and obtaining subcontracts on one or more of the Outstanding Projects with the benefit of knowing the amount of Standard's bids, usurping Standard's corporate opportunities, and copying, reviewing, and using financial and confidential information from Standard's computer system without Standard's authorization, including the Misappropriated Files.

273.    As a result of the Individual Defendants' conspiracy and actions, Standard has suffered damages.

274.    As a result of the Individual Defendants' conspiracy and actions, Standard has lost the architectural metal subcontract on the A3 Project, causing damages that include, but are not limited to, its lost profits of not less than $4,029,436.00.

275.    Upon information and belief, as a result of the Individual Defendants' conspiracy and actions, Standard has suffered damages which include, but are not limited to, lost profits on the architectural sheet metal subcontracts for the Outstanding Projects of not less than $4,791,206.00.

276.    Because of the Individual Defendants' conspiracy and actions, Standard has suffered other damages in an amount to be proven at trial.

277.     Upon information and belief, Standard may also lose other subcontracts because of the conspiracy to breach the fiduciary duties Allen Supplee owed to Standard, and therefore its lost profits may increase.

278.     A breach of a fiduciary duty can be remedied in part by requiring the tortfeasor to return compensation paid while the he or she was in breach of the fiduciary duty.

279.     Standard paid compensation to Allen Supplee while he was actively and intentionally breaching his fiduciary duties to Standard, and Standard is entitled to reimbursement of the same.

280.     The Individual Defendants' conduct in conspiring to breach the fiduciary duties owed to Standard by Allen Supplee was outrageous.

281.     The Individual Defendants' conduct in conspiring to breach the fiduciary duties owed to Standard by Allen Supplee displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against the Individual Defendants, jointly and severally, in the amount of its fair and reasonable damages incurred because of the conspiracy to breach Allen Supplee's fiduciary duties which shall be proven at trial, including, but not limited to, Standard's lost profits of not less than $4,791,206.00, and the compensation paid by Standard to Allen Supplee while he was in breach of his fiduciary duties; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

**Count V**
**Concert of Action**
**Breach of Fiduciary Duties**
**(All Defendants Except Allen Supplee)**

282.     Standard incorporates paragraphs 1 through 281 of this Petition, as if fully set forth herein.

283. P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee knew that Allen Supplee owed fiduciary duties to Standard.

284. P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee knew that Allen Supplee would be breaching his fiduciary duties owed to Standard if he actively worked against Standard's interests and on behalf of P1 Group, both while he was a Director at Standard and after he left Standard to work for P1 Group.

285. P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee gave Allen Supplee substantial assistance and encouragement to breach his fiduciary duties owed to Standard by actively working against Standard's interests and on behalf of P1 Group.

286. Standard has suffered damages a result of the actions of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, described in this Count.

287. As a result the actions described in this Count of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, Standard has lost the architectural metal subcontract on the A3 Project, causing damages that include, but are not limited to, its lost profits of not less than $4,029,436.00.

288. Upon information and belief, as a result the actions described in this Count of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, Standard has suffered damages which include, but are not limited to, lost profits on the architectural sheet metal subcontracts for the Outstanding Projects of not less than $4,791,206.00.

289. As a result the actions described in this Count of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, Standard has suffered other damages in an amount to be proven at trial.

290. Upon information and belief, Standard may also lose other subcontracts because of the actions described in this Count of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, and therefore its lost profits may increase.

291.    The conduct of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee in providing Allen Supplee substantial assistance and encouragement to breach his fiduciary duties was outrageous.

292.    The conduct of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee in providing Allen Supplee substantial assistance and encouragement to breach his fiduciary duties displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, jointly and severally, in the amount of its fair and reasonable damages incurred because of their substantial assistance and encouragement to Allen Supplee in breaching his fiduciary duties which shall be proven at trial, including, but not limited to, Standard's lost profits of not less than $4,791,206.00, and the compensation paid by Standard to Allen Supplee while he was in breach of his fiduciary duties; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

### Count VI
### Breach of Duty of Loyalty
### (Allen Supplee Only)

293.    Standard incorporates paragraphs 1 through 292 of this Petition, as if fully set forth herein.

294.    Allen Supplee owed a duty of loyalty to Standard as the Director of its Architectural Metals Division.

295.    While he was still a Director at Standard, Allen Supplee breached the duty of loyalty he owed Standard.

296.     Upon information and belief, Allen Supplee contacted AOA and/or Finfrock in an effort to secure subcontracts on one or more of the Outstanding Projects for P1 Group, before his resignation from Standard.

297.     Allen Supplee copied and took the Misappropriated Files for the Defendants to use in obtaining subcontracts for P1 Group on the Outstanding Projects and in performing the work on the Outstanding Projects.

298.     While he was still a Director at Standard, Allen Supplee shopped for equipment for P1 Group to purchase and use in order for P1 Group to fabricate and punch architectural sheet metal for use on one or more of the Outstanding Projects.

299.     Through P1 Group, Allen Supplee actively competed against Standard while he was still a Director at Standard.

300.     Allen Supplee's actions on behalf of P1 Group while he was still at Standard went beyond mere planning and preparation.

301.     Allen Supplee's actions in breaching his duty of loyalty to Standard have caused Standard to incur damages that include, but are not limited to, lost profits on the A3 Project of not less than $4,029,436.00.

302.     Upon information and belief, Allen Supplee's actions in breach of his duty of loyalty to Standard have caused Standard to incur damages that include, but are not limited to, lost profits on all of the Outstanding Projects of not less than $4,791,206.00.

303.     Because of the Defendants' conspiracy and actions, Standard has suffered other damages in an amount to be proven at trial.

304.     Upon information and belief, Standard may also lose subcontracts on other jobs because of the breaches of Allen Supplee's duty of loyalty owed to Standard, and therefore its damages, including its damages from its lost profits may increase.

38

305.    Allen Supplee's conduct in breaching his duty of loyalty owed to Standard was outrageous.

306.    Allen Supplee's conduct in breaching his duty of loyalty owed to Standard displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against Allen Supplee for its fair and reasonable damages incurred because of his breaches of the duty of loyalty in an amount to be proven at trial, including, but not limited to, Standard's lost profits of not less than $4,791,206.00; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

**Count VII**
**Conspiracy to Breach the Duty of Loyalty**
**(Individual Defendants Only)**

307.    Standard incorporates paragraphs 1 through 306 of this Petition, as if fully set forth herein.

308.    The Individual Defendants shared the unlawful objective of competing against Standard in breach of Allen Supplee's duty of loyalty to Standard.

309.    There was a meeting of the minds between the Individual Defendants that they would compete against Standard in breach of Allen Supplee's duty of loyalty to Standard by seeking subcontracts on the Outstanding Projects with inside knowledge of the amount of Standard's bids, and copying, reviewing, and using the Misappropriated Files from Standard.

310.    The Individual Defendants committed one or more unlawful overt acts by, among other things, seeking and obtaining subcontracts on the Outstanding Projects in breach of Allen Supplee's duty of loyalty to Standard with inside knowledge of the amount of Standard's bids, and copying, reviewing, and using the Misappropriated Files from Standard.

311.    As a result of the Individual Defendants' conspiracy and actions, Standard has suffered damages.

312.    As a result of the Individual Defendants' conspiracy and actions, Standard has lost the architectural metal subcontract on the A3 Project, causing damages that include, but are not limited to, its lost profits of not less than $4,029,436.00.

313.    Upon information and belief, as a result of the Individual Defendants' conspiracy and actions, Standard has lost architectural metal subcontracts on each of the Outstanding Projects, causing damages that include, but are not limited to, its lost profits of not less than $4,791,206.00.

314.    Because of the Individual Defendants' conspiracy and actions, Standard has suffered other damages in an amount to be proven at trial.

315.    Upon information and belief, Standard may also lose other subcontracts because of the conspiracy to breach the duty of loyalty Allen Supplee owed to Standard, and therefore its lost profits may increase.

316.    The Individual Defendants' conduct in conspiring to breach the duty of loyalty owed to Standard by Allen Supplee was outrageous.

317.    The Individual Defendants' conduct in conspiring to breach the duty of loyalty owed to Standard by Allen Supplee displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against the Individual Defendants, jointly and severally, for its fair and reasonable damages in an amount to be proven at trial that Standard has incurred because of the conspiracy for Allen Supplee to breach his duty of loyalty, including, but not limited to, Standard's lost profits of not less than $4,791,206.00; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

**Count VIII**
**Concert of Action**
**Breach of Duty of Loyalty**
**(All Defendants Except Allen Supplee)**

318.    Standard incorporates paragraphs 1 through 317 of this Petition, as if fully set forth herein.

319.    P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee knew that Allen Supplee owed a duty of loyalty to Standard.

320.    P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee knew that Allen Supplee would be breaching his duty of loyalty to Standard if he actively worked against Standard's interests and on behalf of P1 Group, while he was a Director at Standard.

321.    P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee gave Allen Supplee substantial assistance and encouragement to breach his duty of loyalty to Standard by actively working against Standard's interests and on behalf of P1 Group.

322.    Standard has suffered damages a result of the actions of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, described in this Count.

323.    As a result the actions described in this Count of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, Standard has lost the architectural metal subcontract on the A3 Project, causing damages that include, but are not limited to, its lost profits of not less than $4,029,436.00.

324.    Upon information and belief, as a result the actions described in this Count of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, Standard has suffered damages which include, but are not limited to, lost profits on the architectural sheet metal subcontracts for the Outstanding Projects of not less than $4,791,206.00.

325.    As a result the actions described in this Count of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, Standard has suffered other damages in an amount to be proven at trial.

326. Upon information and belief, Standard may also lose other subcontracts because of the actions described in this Count of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, and therefore its lost profits may increase.

327. The conduct of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee in providing Allen Supplee substantial assistance and encouragement to breach his duty of loyalty to Standard was outrageous.

328. The conduct of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee in providing Allen Supplee substantial assistance and encouragement to breach his duty of loyalty to Standard displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, jointly and severally, in the amount of its fair and reasonable damages incurred because of their substantial assistance and encouragement to Allen Supplee in breaching his duty of loyalty which shall be proven at trial, including, but not limited to, Standard's lost profits of not less than $4,791,206.00; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

## Count IX
## Misappropriation of Trade Secrets

329. Standard incorporates paragraphs 1 through 328 of this Petition, as if fully set forth herein.

330. The following trade secrets belong to Standard (the "Trade Secrets"): actual amounts and details of bids Standard submitted on the Outstanding Projects, detailed estimates upon which Standard's bids on the Outstanding Projects were based, the take-off information for the Outstanding Projects, the design concepts and sketches Standard prepared for the Outstanding

Projects, work in progress spreadsheets for the A1 and A2 Garages, and the engineering plans and detailed part drawings for the A2 Garage.

331.    The Trade Secrets took a substantial amount of time, money, and effort for Standard to develop.

332.    The Defendants could use the Trade Secrets to obtain the subcontracts on the Outstanding Projects and to aid in the performance of the work on the Outstanding Projects that P1 Group does obtain.

333.    Knowing Standard's confidential bids on the Outstanding Projects also allowed P1 Group to meet or beat the amount of that bid.

334.    Standard reasonably maintained the confidentiality of the Trade Secrets by only disclosing them to the individuals and Directors within the company who needed to know them.

335.    Standard had a company policy of only disclosing confidential information such as the Trade Secrets to employees and third parties that needed to know the information in furtherance of Standard's interests.

336.    Allen Supplee acquired Trade Secrets by improper means when he copied and took from Standard the Misappropriated Files and others, in breach of his duty of loyalty and the obligations imposed by the Handbook, for the use by the Defendants in competing against Standard.

337.    Upon information and belief, the Defendants have acquired Standard's Trade Secrets from Allen Supplee while knowing or having reason to know that Allen Supplee acquired them by improper means.

338.    Upon information and belief, Allen Supplee disclosed the Trade Secrets that he acquired by improper means to the rest of the Defendants without Standard's consent.

339.     Upon information and belief, the Defendants have used Standard's Trade Secrets without Standard's consent, and at the time the Defendants used the Trade Secrets that knew or had reason to know: that Allen Supplee used improper means to acquire the Trade Secrets; that Allen Supplee acquired the Trade Secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use; and that the Trade Secrets were derived from or through Allen Supplee while he owed a duty to Standard to maintain their secrecy or limit their use.

340.     Upon information and belief, each of the Individual Defendants used, acquired, and/or disclosed Standard's Trade Secrets on behalf of P1 Group, with P1 Group's consent to acting on its behalf, and while the Individual Defendants were subject to P1 Group's control.

341.     Standard has suffered damages as a result of the Defendants' use, acquisition, and/or disclosure of Standard's Trade Secrets.

342.     The Defendants' use, acquisition, and/or disclosure of Standard's Trade Secrets has caused Standard to suffer damages, including, but not limited to, lost profits on the A3 Project of not less than $4,029,436.00.

343.     Upon information and belief, the Defendants' use, acquisition, and/or disclosure of Standard's Trade Secrets has caused Standard to suffer damages, including, but not limited to, lost profits on the Outstanding Projects of not less than $4,791,206.00.

344.     Upon information and belief, Standard may also lose subcontracts on other jobs because of the Defendants' use, acquisition, and/or disclosure of Standard's Trade Secrets, and therefore its damages from its lost profits may increase.

345.     Because of the Defendants' use, acquisition, and/or disclosure of Standard's Trade Secrets, Standard has suffered other damages in an amount to be proven at trial.

346.     The Defendants have been unjustly enriched by their use, acquisition, and/or disclosure of Standard's Trade Secrets.

347.     The Defendants' use, acquisition, and/or disclosure of Standard's Trade Secrets was outrageous.

348.     The Defendants' use, acquisition, and/or disclosure of Standard's Trade Secrets displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against the Defendants, jointly and severally, for its fair and reasonable damages incurred because of the Defendants' use, acquisition, and/or disclosure of Standard's Trade Secrets in an amount to be proven at trial, including, but not limited to, Standard's lost profits of not less than $4,791,206.00 and the amount by which the Defendants have been unjustly enriched by the Trade Secrets; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

### Count X
### Conspiracy to Misappropriate Trade Secrets
### (Individual Defendants Only)

349.     Standard incorporates paragraphs 1 through 348 of this Petition, as if fully set forth herein.

350.     The Individual Defendants shared the unlawful objective of using, acquiring, and disclosing Standard's Trade Secrets.

351.     There was a meeting of the minds between the Individual Defendants that they would misappropriate Standard's Trade Secrets by, among other things, accessing and copying Standard's computer data without authorization in breach of Allen Supplee's fiduciary duties and duty of loyalty to Standard in order to tortiously interfere with Standard's business expectancies.

352.     The Individual Defendants committed one or more unlawful overt acts because they misappropriated Standard's trade secrets by, among other things, accessing and copying

Standard's computer data without authorization in breach of Allen Supplee's fiduciary duties and duty of loyalty to Standard in order to tortiously interfere with Standard's business expectancies.

353.     Standard has suffered damages as a result of the Individual Defendants' conspiracy to use, acquire, and/or disclose of Standard's Trade Secrets.

354.     The Individual Defendants' conspiracy to use, acquire, and/or disclose Standard's Trade Secrets has caused Standard to suffer damages, including, but not limited to, lost profits on the A3 Project of not less than $4,029,436.00.

355.     Upon information and belief, the Individual Defendants' conspiracy to use, acquire, and/or disclose Standard's Trade Secrets has caused Standard to suffer damages, including, but not limited to, lost profits on all of the Outstanding Projects of not less than $4,791,206.00.

356.     Upon information and belief, Standard may also lose subcontracts on other jobs because of the Individual Defendants' conspiracy to use, acquire, and/or disclose Standard's Trade Secrets, and therefore its damages from its lost profits may increase.

357.     Because of the Individual Defendants' conspiracy to use, acquire, and/or disclose Standard's Trade Secrets, Standard has suffered other damages in an amount to be proven at trial.

358.     The Individual Defendants have been unjustly enriched by their conspiracy to use, acquire, and/or disclose of Standard's Trade Secrets.

359.     The Individual Defendants' conspiracy to use, acquire, and/or disclose Standard's Trade Secrets was outrageous.

360.     The Individual Defendants' conspiracy to use, acquire, and/or disclose Standard's Trade Secrets displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against the Individual Defendants, jointly and severally, for its fair and reasonable damages incurred because

of the Individual Defendants' conspiracy to use, acquire, and/or disclose Standard's Trade Secrets in an amount to be proven at trial, including, but not limited to, Standard's lost profits of not less than $4,791,206.00 and the amount by which the Individual Defendants have been unjustly enriched by the Trade Secrets; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

**Count XI**
**Concert of Action**
**Misappropriation of Trade Secrets**
**(All Defendants Except Allen Supplee)**

361.    Standard incorporates paragraphs 1 through 360 of this Petition, as if fully set forth herein.

362.    P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee knew that the Trade Secrets belonged to Standard.

363.    P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee gave Allen Supplee substantial assistance and encouragement to use, acquire, and/or disclose Standard's Trade Secrets.

364.    Standard has suffered damages a result of the actions of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, described in this Count.

365.    As a result the actions described in this Count of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, Standard has lost the architectural metal subcontract on the A3 Project, causing damages that include, but are not limited to, its lost profits of not less than $4,029,436.00.

366.    Upon information and belief, as a result the actions described in this Count of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, Standard has suffered damages which include, but are not limited to, lost profits on the architectural sheet metal subcontracts for the Outstanding Projects of not less than $4,791,206.00.

367.    As a result the actions described in this Count of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, Standard has suffered other damages in an amount to be proven at trial.

368. Upon information and belief, Standard may also lose other subcontracts because of the actions described in this Count of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, and therefore its lost profits may increase.

369. The conduct of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee in providing Allen Supplee substantial assistance and encouragement to use, acquire, and/or disclose Standard's Trade Secrets was outrageous.

370. The conduct of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee in providing Allen Supplee substantial assistance and encouragement to use, acquire, and/or disclose Standard's Trade Secrets displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, jointly and severally, in the amount of its fair and reasonable damages incurred because of their substantial assistance and encouragement to Allen Supplee in using, acquiring, and/or disclosing Standard's Trade Secrets in an amount to be proven at trial, including, but not limited to, Standard's lost profits of not less than $4,791,206.00 and the amount by which they have been unjustly enriched by the Trade Secrets; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

## Count XII
## Tampering with Computer Data

371. Standard incorporates paragraphs 1 through 370 of this Petition, as if fully set forth herein.

372. Allen Supplee committed acts in violation of R.S.Mo. § 569.095 by tampering with Standard's computer data, for which R.S.Mo. § 537.525 has created a private cause of action.

48

373. Without authorization and without reasonable grounds to believe he had authorization, Allen Supplee modified or destroyed data or programs—such as the text messages on his Standard-issued iPhone—existing internal and/or external to a computer and/or computer network owned or leased by Standard, on behalf of P1 Group, with P1 Group's consent to acting on its behalf, and while he was subject to P1 Group's control.

374. Without authorization or without reasonable grounds to believe that he had authorization, Allen Supplee disclosed and took data existing internal and/or external to a computer and/or computer network owned or leased by Standard, on behalf of P1 Group, with P1 Group's consent to acting on its behalf, and while he was subject to P1 Group's control.

375. The Defendants received, retained, used, and/or disclosed data they knew or believed was obtained in violation of R.S.Mo. § 569.095.

376. Standard incurred damages in an amount to be proven at trial because of the Defendants' violations of R.S.Mo. § 569.095.

377. Because the Defendants violated R.S.Mo. § 569.095, Standard is entitled to recover its compensatory damages, as well as the expenditures reasonably and necessarily incurred by Standard to verify the computer data was not altered, damaged, or deleted by Allen Supplee, and the Court may award Standard its attorneys' fees, pursuant to R.S.Mo. § 537.525.

378. The Defendants' violations of R.S.Mo. § 569.095 were outrageous.

379. The Defendants' violations of R.S.Mo. § 569.095 displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against the Defendants, jointly and severally, in the amount of its fair and reasonable damages incurred because of the Defendants' violations of R.S.Mo. § 569.095 in an amount to be proven at trial; plus the expenditures reasonably and necessarily incurred by Standard to verify the computer data

was not altered, damaged, or deleted by Allen Supplee and Standard's reasonable attorneys' fees; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

**Count XIII**
**Conspiracy to Tamper with Computer Data**
**(Individual Defendants Only)**

380.    Standard incorporates paragraphs 1 through 379 of this Petition, as if fully set forth herein.

381.    The Individual Defendants shared the unlawful objective of tampering with Standard's computer data in violation of R.S.Mo. § 569.095.

382.    There was a meeting of the minds between the Individual Defendants that they would tamper with Standard's computer data by, among other things, receiving, retaining, using, and/or disclosing Standard's computer data without authorization in breach of Allen Supplee's fiduciary duties and duty of loyalty to Standard in order to tortiously interfere with Standard's business expectancies.

383.    The Individual Defendants committed one or more unlawful overt acts because they tampered with Standard's computer data by receiving, retaining, using, and/or disclosing Standard's computer data without authorization in breach of Allen Supplee's fiduciary duties and duty of loyalty to Standard in order to tortiously interfere with Standard's business expectancies.

384.    Standard incurred damages in an amount to be proven at trial because of the Individual Defendants' conspiracy to violate R.S.Mo. § 569.095.

385.    Because the Individual Defendants conspired to violate R.S.Mo. § 569.095, Standard is entitled to recover its compensatory damages, including the expenditures reasonably and necessarily incurred by Standard to verify the computer data was not altered, damaged, or

deleted by Allen Supplee, and the Court may award Standard its attorneys' fees, pursuant to R.S.Mo. § 537.525.

386. The Individual Defendants' conduct related to their conspiracy to violate R.S.Mo. § 569.095 was outrageous.

387. The Individual Defendants' conduct related to their conspiracy to violate R.S.Mo. § 569.095 displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against the Individual Defendants, jointly and severally, in the amount of its fair and reasonable damages incurred because of the Individual Defendants' conspiracy to violate R.S.Mo. § 569.095 in an amount to be proven at trial; plus the expenditures reasonably and necessarily incurred by Standard to verify the computer data was not altered, damaged, or deleted by Allen Supplee and Standard's reasonable attorneys' fees; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

## Count XIV
## Concert of Action
## Tampering with Computer Data
## (All Defendants Except Allen Supplee)

388. Standard incorporates paragraphs 1 through 387 of this Petition, as if fully set forth herein.

389. P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee knew that Allen Supplee lacked the authorization to tamper with Standard's computer data in violation of R.S.Mo. § 569.095.

390. P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee gave Allen Supplee substantial assistance and encouragement to tamper with Standard's computer data in violation of R.S.Mo. § 569.095.

391. Standard has suffered damages a result of the actions of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee.

392. The conduct of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee in providing Allen Supplee substantial assistance and encouragement to tamper with Standard's computer data in violation of R.S.Mo. § 569.095 was outrageous.

393. The conduct of P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee in providing Allen Supplee substantial assistance and encouragement to tamper with Standard's computer data in violation of R.S.Mo. § 569.095 displayed an evil motive and a reckless indifference to the rights of others, namely Standard.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against the P1 Group, Smitty Belcher, Bruce Belcher, and Ted Supplee, jointly and severally, in the amount of its fair and reasonable damages incurred because of their substantial assistance and encouragement to Allen Supplee to violate R.S.Mo. § 569.095 in an amount to be proven at trial; plus the expenditures reasonably and necessarily incurred by Standard to verify the computer data was not altered, damaged, or deleted by Allen Supplee and Standard's reasonable attorneys' fees; plus punitive damages, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

### Count XV
### Constructive Trust
### (P1 Group Only)

394. Standard incorporates paragraphs 1 through 393 of this Petition, as if fully set forth herein.

395. The Defendants' actions have wrongfully deprived Standard of the right and interest in the architectural metal subcontract on the A3 Project.

396.    Upon information and belief, the Defendants' actions have wrongfully deprived Standard of the right and interest in subcontracts on all of the Outstanding Projects.

397.    P1 Group has entered into a subcontract on the A3 Project, thereby preventing Standard from enjoying the profits on these jobs.

398.    Upon information and belief P1 Group has entered into subcontracts on all of the Outstanding Projects, thereby precluding Standard from enjoying the profits on these jobs.

399.    P1 Group was able to enter into the subcontract on the A3 Project as a result of Allen Supplee's breaches of his duty of loyalty and fiduciary duties to Standard on behalf of P1 Group, for which all of the Defendants conspired, as explained above.

400.    Upon information and belief, P1 Group has entered into subcontracts on all of the Outstanding Projects, as a result of Allen Supplee's breaches of his duty of loyalty and fiduciary duties to Standard on behalf of P1 Group, for which all of the Defendants conspired, as explained above.

401.    In order to remedy the wrongful deprivation of Standard's right and interest in the Outstanding Projects, the Court should impose a constructive trust upon P1 Group's profits on the Outstanding Projects for the benefit of Standard.

WHEREFORE, Standard requests the Court to impose a constructive trust for the benefit of Standard upon P1 Group's profits on the Outstanding Projects, as well as any other projects that the Defendants have wrongfully deprived Standard from obtaining; for costs and post-judgment interest; and for such other and further relief as the Court deems just and proper.

### Count XVI
### RICO
### (Individual Defendants Only)

402.    Standard incorporates paragraphs 1 through 401 of this Petition, as if fully set forth herein.

403.　　The Individual Defendants are all "persons" under 18 U.S.C. § 1961(3) because they are individuals capable of holding a legal or beneficial interest in property.

404.　　For purposes of this Count, P1 Group is as an "enterprise" pursuant to 18 U.S.C. § 1961(4) because it is a corporation that is distinct from the Individual Defendants.

405.　　At all times relevant hereto, the Individual Defendants participated in the operation and/or management of P1 Group's affairs.

406.　　P1 Group engages in interstate commerce, and its activities affect interstate commerce.

407.　　The Individual Defendants committed the crime of theft of trade secrets under 18 U.S.C. § 1832, which is listed as a predicate act of racketeering activity by 18 U.S.C. § 1961(1).

408.　　At all times relevant hereto, the Individual Defendants acted willfully and with actual knowledge of their illegal acts, namely theft of trade secrets under 18 U.S.C. § 1832.

409.　　Standard's Trade Secrets are related to products and services used in and intended for use in interstate commerce.

410.　　At all times relevant hereto, the Individual Defendants acted with the intent to convert Standard's Trade Secrets for the economic benefit of themselves and P1 Group.

411.　　At all times relevant hereto, the Individual Defendants acted with the intent and knowledge that their actions related to Standard's Trade Secrets and that they would injure Standard.

412.　　Allen Supplee knowingly stole Standard's Trade Secrets, and without authorization he appropriated, took, carried away, and concealed Standard's Trade Secrets, and all of the Individual Defendants conspired to do the same.

413.　　Upon information and belief, Allen Supplee and/or other of the Individual Defendants, knowingly and without authorization, copied, duplicated, sketched, drew,

photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, and/or conveyed the Trade Secrets, and all of the Individual Defendants conspired to do the same.

414.     Upon information and belief, Allen Supplee and/or other of the Individual Defendants, knowingly received and possessed Standard's Trade Secrets with knowledge that they were stolen, appropriated, obtained, or converted without authorization, and all of the Individual Defendants conspired to do the same.

415.     The actions of the Individual Defendants described above in relation to Standard's Trade Secrets constitute "racketeering activity" as that term is defined in 18 U.S.C. § 1961(1).

416.     One or more of the Individual Defendants conducted a "pattern of racketeering activity" under 18 U.S.C. § 1961(5) by committing at least two acts of racketeering activity—*i.e.*, theft of trade secrets—one of which occurred within ten years of each other.

417.     On multiple instances, Allen Supplee knowingly stole and without authorization took Standard's Trade Secrets, which constituted predicate acts of racketeering activity, including when he: copied Trade Secrets onto two different thumb drives at different times on April 24, 2017; copied Trade Secrets onto another thumb drive on May 5, 2017; uploaded Trade Secrets to a Dropbox account; and stole paper files containing Trade Secrets.

418.     Upon information and belief, as early as March 9, 2017, the Individual Defendants knowingly began conspiring to steal and without authorization take Standard's Trade Secrets, which constituted predicate acts of racketeering activity.

419.     Upon information and belief, one or more the Individual Defendants knowingly copied, duplicated, and/or replicated the Trade Secrets that Allen Supplee stole before returning the Misappropriated Files to Standard, which constituted predicate acts of racketeering activity.

420.     Upon information and belief, the Individual Defendants knowingly conspired to copy, duplicate, and/or replicate the Trade Secrets that Allen Supplee stole before returning the Misappropriated Files to Standard, which constituted predicate acts of racketeering activity.

421.     Upon information and belief, one or more of the Individual Defendants knowingly delivered, sent, communicated, and/or conveyed Standard's Trade Secrets to general contractors and/or owner's representatives, which constituted predicate acts of racketeering activity.

422.     Upon information and belief, the Individual Defendants knowingly conspired to deliver, send, communicate, and/or convey Standard's Trade Secrets to general contractors and/or owner's representatives, which constituted predicate acts of racketeering activity.

423.     Allen Supplee knowingly received and possessed Standard's Trade Secrets, knowing the same to have been stolen or appropriated, obtained, or converted without authorization, which constituted predicate acts of racketeering activity.

424.     Upon information and belief, other Individual Defendants knowingly received and possessed Standard's Trade Secrets, knowing the same to have been stolen or appropriated, obtained, or converted without authorization, which constituted predicate acts of racketeering activity.

425.     Upon information and belief, one or more of the Individual Defendants still has receipt and possession of Standard's Trade Secrets, knowing the same to have been stolen or appropriated, obtained, or converted without authorization.

426.     By their very nature, there is a threat of repetition of the Individual Defendants' predicate acts of theft of Standard's Trade Secrets.

427.     Standard's Trade Secrets continue to offer value to P1 Group in bidding, obtaining, scheduling, and performing architectural sheet metal projects, and thus there is a continued threat

that the Individual Defendants will continue to possess, communicate, and convey Standard's Trade Secrets.

428.    The Individual Defendants' predicate acts of theft of Standard's Trade Secrets are related because they involve the same or similar purposes, results, participants, victim, and other methods of commission.

429.    Upon information and belief, each of the Individual Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of P1 Group's affairs through a pattern of racketeering activity, while they have been employed by or associated with P1 Group, 18 U.S.C. § 1962(c).

430.    Upon information and belief, each of the Individual Defendants have conspired to conduct and/or participate, directly and/or indirectly, in the conduct of P1 Group's affairs through a pattern of racketeering activity, while they have been employed by or associated with P1 Group, in violation of 18 U.S.C. § 1962(d), and multiple overt acts in furtherance of this conspiracy have occurred.

431.    Standard has been injured in its business and/or property as a direct and proximate result of the Individual Defendants' violations of 18 U.S.C. § 1962(c) and (d).

432.    But for the Individual Defendants violations of 18 U.S.C. § 1962(c) and (d), Standard would not have suffered injuries, including, but not limited to, lost profits on jobs to which Standard's Trade Secrets relate, which injuries were reasonably foreseeable by the Individual Defendants based on their actions.

433.    The Individual Defendants' violations of 18 U.S.C. § 1962(c) and (d) have caused Standard to suffer damages, including, but not limited to, lost profits on the A3 Project of not less than $4,029,436.00.

434.    Upon information and belief, the Individual Defendants' violations of 18 U.S.C. § 1962(c) and (d) have caused Standard to suffer damages, including, but not limited to, lost profits on all of the Outstanding Projects of not less than $4,791,206.00.

435.    Upon information and belief, Standard may also lose subcontracts on other jobs because of the Individual Defendants' violations of 18 U.S.C. § 1962(c) and (d), and therefore its damages from its lost profits may increase.

436.    Because of the Individual Defendants' violations of 18 U.S.C. § 1962(c) and (d), Standard has suffered other damages in an amount to be proven at trial.

WHEREFORE, Standard requests the Court to enter judgment in its favor and against the Individual Defendants, jointly and severally, for three times its fair and reasonable damages incurred because of the Individual Defendants' violations of 18 U.S.C. § 1962(c) and (d), including, but not limited to, Standard's lost profits of not less than $4,791,206.00; plus Standard's reasonable attorneys' fees, costs, and post-judgment interest; and for such other and further relief as the Court deems just and proper.

## Demand for Jury Trial

Standard hereby demands a jury trial on all matters in this Petition that are triable by a jury.

Respectfully submitted,

**BROWN & RUPRECHT, PC**

By:  _/s/ Heather F. Shore_____
Heather F. Shore, MO Bar #57048
Brian L. Palmer, MO Bar #66132
2323 Grand Blvd., Suite 1100
Kansas City, MO  64108
(816) 292-7000 Telephone
(816) 292-7050 Facsimile
Email: hshore@brlawkc.com
        bpalmer@brlawkc.com
ATTORNEYS FOR PLAINTIFF STANDARD
SHEET METAL, INC.